## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN P. McDAID, SCOTT WALTERS, JODI SIEGEL, JEFFREY KAUFMAN, KEVIN UNGER, ALAN CORDOVER, JARRED LOKIETZ and BRANDON TARAGANO on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>DRAFTKINGS, INC. and FANDUEL, INC.<br><br>    Defendants. | Civil Action No.<br><br>**[Proposed]**<br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, JOHN P. McDAID, SCOTT WALTERS, JODI SIEGEL, JEFFREY KAUFMAN, KEVIN UNGER, ALAN CORDOVER, JARRED LOKIETZ and BRANDON TARAGANO ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their counsel, bring this action against DraftKings, Inc. ("DraftKings") and FanDuel, Inc. ("FanDuel"), (collectively "Defendants"), and state as follows:

### JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides federal courts original jurisdiction over any class action in which any member of a class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million ($5,000,000.00), exclusive of interest and costs.

1

2.       This court has personal jurisdiction over Defendants in that they conduct substantial business activity in the State of New York.

3.       Venue is proper in this Court pursuant to 28 U.S. C. §1391 in that many of the acts and transactions giving rise to this action occurred in the Southern District of New York and FanDuel's headquarters are in this District.

## THE PARTIES

4.       Plaintiff John P. McDaid is a resident of the Rockville Centre, Nassau County, in the State of New York.

5.       Plaintiff Scott Walters is a resident of Merrick, Nassau County, in the State of New York.

6.       Plaintiff Jodi Siegel is a resident of Berkeley Heights in the State of New Jersey.

7.       Plaintiff Jeffrey Kaufman is a resident of Parkland in the State of Florida.

8.       Plaintiff Kevin Unger is a resident of Parkland in the State of Florida.

9.       Plaintiff Alan Cordover is a resident of Parkland in the State of Florida.

10.      Plaintiff Jarred Lokietz is a resident of Parkland in the State of Florida.

11.      Plaintiff Brandon Taragano is a resident of Parkland in the State of Florida.

12.      Defendant DraftKings, is organized and existing under the laws of Delaware, with its principal place of business in located at 225 Franklin St. Boston, Massachusetts 02110.

13.      Defendant FanDuel, is, organized and existing under the laws of Delaware, with its principal place of business in located at 1375 Broadway, New York, New York 10018.

14.      Upon information and belief, Defendants conduct business, and communicate and

transmit information in the course of their business through mail and wires, in and into the State of New York and this District.

## BACKGROUND INFORMATION

15.     Defendants operate daily and weekly fantasy sports ("DFS") websites in a manner which give rise under the law to the claims in this Complaint.  Defendants offer daily and weekly fantasy sports contests for cash prizes in major sports (e.g. MLB, NHL, NFL, and NBA) as well as college football and basketball.  The unregulated DFS industry offers contests which allow customers ("players") to create new "fantasy teams" each day or week by selecting a line-up of real-life athletes at certain positions until they have reached a given "salary cap" per team.  With their selected fantasy teams, players join new public and private leagues or tournaments ranging in size.  In these contests, individual players compete against other sports fans by accumulating points based on the real-life statistical performance of their selected professional or college athletes as they performed during the designated day or week.  The players who accumulate the most points win the most money.  These contests take place over a much shorter duration than the traditional season-long fantasy leagues and require no management on the part of the player after the initial selection is finalized before the start of contest.  As a result, winners are determined daily or weekly and cash winnings can be collected within a short period.

16.     The Defendants flooded the market with more than $100,000,000 worth of television advertisements at the start of the 2015 NFL season.  Defendants were successful in adding millions of new players to their website contests as a result of this tremendous media campaign.[1]

---

[1] http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/ (accessed Oct. 14, 2015)

17.    The charging of entry fees to enter a contest is the basis of Defendants' revenues and profitability. The revenues Defendants generate for each contest depends on the entry fee, among other factors, and vary widely. Defendants often guarantee prize pool winnings, and, when necessary, cover the difference for the contestants between the guaranteed prize amount and the sum total of entry fees.

18.    The difference between the entry fees and the guarantee in the prize pool is called the "overlay." Because the overlay is guaranteed by Defendants as the DFS provider, Defendants maintain an additional incentive to attract as many customers and entries as possible into their DFS contests to avoid having to cover the overlay out of pocket.

19.    DraftKings relies on new users who lack skill to keep its most active users -- and therefore profitable entry fee generators – on their site.[2]

20.    The Chief Executive Officer ("CEO") of FanDuel has expressed a vision of molding its DFS website in to a mass market site appealing to, not only sophisticated DFS players, but casual sports fans as well.[3]

21.    Plaintiffs and members of the proposed classes, paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' and/or FanDuel's websites to play in their respective DFS contests. Specifically, over the past months, Plaintiff John P. McDaid paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' and FanDuel's websites in the approximate amounts of $10 a week for DFS football contests and $2 a day for DFS baseball contests. Over the past months, Plaintiff Scott Walters

---

[2] See https://rotogrinders.com/threads/dk-frequent-player-points-130623; https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5 (accessed Oct. 14, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins).
[3] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10 (accessed Oct. 14, 2015).

paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amounts of $40 a week for DFS football contests and $25-50 a month for DFS baseball and hockey contests. Over the past months, Plaintiff Jodi Siegel paid, placed, deposited, submitted, risked, and/or invested money or funds into FanDuel's website in the approximate amount of $100.  Over the past months, Plaintiff Jeffrey Kaufman paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amount of $5.  Over the past months, Plaintiff Kevin Unger paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amount of $50 and approximately $25 in FanDuel's website.  Over the past months, Plaintiff Alan Cordover paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amount of $170.  Over the past months, Plaintiff Jarred Lokietz paid, placed, deposited, submitted, risked, and/or invested money or funds in the approximate amounts of $100 into DraftKings' website and $100 into FanDuel's websites.  Over the past years and/or months, Plaintiff Brandon Taragano twice paid, placed, deposited, submitted, risked, and/or invested money or funds in the approximate amount of $100 into DraftKings' website.

22.    Defendants marketed and represented to the public that the fantasy sports contests run by their companies as provided on their websites were fair games of skill where sports fans could compete against one another and earn money on a fair and level playing field.

23.    Defendants' presented their websites as places where the Plaintiffs' skill made a difference between winning and losing. For instance, in a television commercial[4] that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your

---

[4] The commercial is available at https://www.youtube.com/watch?v=VDa-cDu8KYg (accessed Oct. 14, 2015).

skills....you like football, you like winning." In another commercial in August 2015[5], DraftKings advertised its website as "a game within the game, that requires a different set of skills...we don't just play, we are players, we train, and we win."

24.     Similarly, FanDuel advertised that players could "get paid for [their] knowledge" and directly implied that they could profit if they were "smarter than the average fan."[6]

25.     In reality, most of the cash winnings on DFS sites goes to a few individuals at the top. An analysis of publicly available data by Sports Business Daily found that in the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[7] An analysis done by *Sports Business Journal* over a three month period showed a similar distribution heavily weighted towards the top 1.3% of players.[8]

26.     Defendants represented that players who "do their homework," who are "analytical and favor data and research," could succeed like successful investors in the stock market.[9]

27.     In reality, Defendants' contests were unfair and did not maintain an even-level playing field for all players. Although Defendants prohibited their employees from entering DFS contests on their DFS sites, Defendants' respective company policies permitted their employees, some of whom were equipped with the advantage of non-public, confidential, and/or internal company information and analytics, to enter DFS contests on the other company's site for cash prizes along with the rest of the population.

[5] Available at https://www.youtube.com/watch?v=bfCm6PJuL5I (accessed Oct. 14, 2015).
[6] Available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge.
[7] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 14, 2015).
[8] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (accessed Oct. 14, 2015)
[9] Howard Stutz, "DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing, Las Vegas Review-Journal," Sept. 29, 2015, available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (accessed Oct. 14, 2015).

28.     Defendants perform analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on a competitor's website would do if they were entered into their own company's contests. Defendants know the value of this information and know that it should not be revealed to the playing public. With this data on optimal DFS playing strategies from years past, only available to some of Defendants' employees and not the general playing public, those employees can and in fact did exploit their access to their company's inside information to maintain a potential advantage when playing on a competitor's site.

29.     Moreover, individuals with real-time access as to how many active players selected certain athletes for their current "fantasy teams," would have a great advantage in competing for cash prizes in current contests offered by a competitor DFS site since, the larger prizes are won by customers where their teams are comprised of players who appear on fewer rosters but pulled off a big win.[10] Thus, the statistical data can be used to draft a team of players that appear on fewer rosters in each contest thereby significantly increasing the winnings of an individual where those players perform well.[11] In this light, the majority of industry sources believe that knowing the ownership percentage of DFS players provides contestants with an advantage against competitor contestants. Adding players who are being selected by only a small percentage of entrants is a prominent strategy in daily fantasy contests, especially in large contests with hundreds of thousands of entries. Winning entries in these huge guaranteed prize pool tournaments, where millions of dollars are at stake, often feature a professional athlete or

---

[10] Darren Rovell "Class action lawsuit filed against DraftKings and FanDuel," http://espn.go.com/espn/print?id=13840184, Oct. 8, 2015.
[11] Associated Press, "Early lineup release raised questions about transparence of daily fantasy contests," http://www.usnews.com/news/sports/articles/2015/10/05/lineup-release-raises-questions-about-daily-fantasy-contests, Oct. 5, 2015.

athletes who are owned by a small percentage of entrants, but go on to have better-than-expected performances. [12]

30.     Moreover, DFS employees' access to non-public, confidential, and/or internal company information provides them an advantage in their ability to copy strategies and rosters of higher ranking players and employ them on another competitor's DFS contest to thereby reap profits based on this insider information.

31.     In fact, DraftKings co-founder Paul Liberman stated at a conference last month at Babson College that some of the Company's employees made more money from playing other fantasy sites than their salaries at DraftKings. [13]

32.     Indeed, a DraftKings employee accidentally posted ownership percentages online before they were permitted to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed. This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site." [14]

33.     However, the same week that he posted roster data prematurely, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000. [15] An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to a position with DraftKings working directly for a DFS company.

---

[12] David Purduriand Darren Rovell, "Answering seven biggest questions on the DraftKings data leak," http://espn.go.com/chalk/story/_/id/13822696/chalk-breaking-significance-recent-draftkings-daily-fantasy-incident (accessed Oct 13, 2015).
[13] "Class action lawsuit filed against DraftKings and FanDuel," by Darren Rovell, http://espn.go.com/espn/print?id=13840184, Oct. 8, 2015.
[14] See https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 14, 2015) for the DraftKings employee's admission and apology.
[15] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 14, 2015).

34.     In response to publication of the news of DraftKings' employee winning $350,000, rather than admit what was patently clear -- that this employee had access to important DFS ownership data which most likely accounted for his tremendous winnings that day and throughout the year -- DraftKings and FanDuel both responded that his success was essentially a mere "coincidence" and unrelated to his employment at DraftKings.[16]

35.     In fact, on October 14, 2015, The New York Times reported that the Federal Bureau of Investigation ("FBI") had begun an inquiry into the practices of the DFS websites shortly after a DraftKing employee admitted to inadvertently releasing data before lineups for the start of the third week of N.F.L. The FBI had begun contacting several prominent competitors in the contests for interviews and had inquired if the players had knowledge of whether employees of DraftKings passed on proprietary information or preyed on fantasy players in contests.

36.     At least a number of Defendant employees have access to inside DFS data which could provide a competitive advantage in DFS competition on other websites.  These include Defendant employees working as customer service and engineering workers.  The company even maintains records of such employee access.[17]

37.     DraftKings' employees have won roughly $6,000,000 participating as players on FanDuels' website.[18]  This is an extraordinary amount considering DraftKings has only been in operation for a few years.  The incident also reveals that FanDuel can calculate and track which DFS players are associated with other DFS sites and how much they are winning or

[16] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 14, 2015).
[17] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 14, 2015).
[18] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 14, 2015).

losing[19], and the statistical likelihood that these players are using non-public information, data, and insider strategic information.

38.    Defendants were aware of their employees' participation on competing DFS sites and winning high and statistically relevant amounts of cash winnings.

39.    In fact, FanDuel's CEO admitted to personally playing on competitor DFS sites, "including in [FanDuel's] companywide season long and daily leagues."[20]  Moreover, FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website.[21]

40.    An analysis by *Daily Fantasy Sports Report* also reveals that an employee at FanDuel who works in product operations is a top DFS player in the industry, despite only playing on one DFS site. While there is no evidence this employee had access to ownership data, this individual has won at least $50,000 in the early part of the baseball season on other DFS sites. Significantly, one of this employee's responsibilities at FanDuel, includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites. Although the profile piece has been removed from FanDuel's website, a version remains on the internet. Another FanDuel employee, commenting in these reports, stated that: "The fact [that that FanDuel employee] does not play on FanDuel against you folks is a good thing. He clearly has a winning strategy...or 10."[22]

41.    According to Legal Sports Report ("LSR"), an "industry insider who wished to

---

[19] Id (accessed Oct. 14, 2015).
[20] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (accessed Oct. 14, 2015).
[21] Richard Lawler, "DraftKings and FanDuel face questions about 'insider trading,'" http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 14, 2015).
[22] Id (accessed Oct. 14, 2015).

remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[23]

42.     In addition to being aware of this practice, Defendants have had reservations about its propriety, and considered alternative company policies to ensure that Defendant employees could not play DFS on competitor DFS sites with an advantage and thereby negatively impact the integrity of the game.  In fact, Jason Robins, the chief executive of DraftKings, has noted that "he had 'some reservations' about [DFS] employees entering fantasy sports contests for cash prizes and privately suggested that his company and its rivals restrict the practice. . . . 'I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one [banning DFS company employees from participating in most online DFS contests] in place.'"[24] Ultimately, Defendants worked in concert to permit their employees by way of company policy and/or negligence, to play in DFS contests on other outside DFS websites and to permit employees of other DFS sites to play in DFS contests provided on their sites.

43.     Plaintiffs and members of the proposed classes were fraudulently induced into placing, depositing, submitting, and/or investing funds into Defendants' websites believing the contests constituted fair games of skill that ensured an even-level playing field for all players where no players were permitted to compete with the advantage of access to non-public, confidential, and/or internal company information and/or analytics.

---

[23] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 14, 2015).
[24] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 14, 2015).

44.     Had Plaintiffs and members of the proposed classes known that Defendants'

contests were unfair and not on a level playing field, and/or that some players maintained an

advantage by competing while maintaining access to non-public, confidential, and/or internal

company information and analytics, including information and analytics generated by

Defendants or their employees, in the course of their business activities or otherwise, Plaintiffs

and members of the proposed classes would not have paid, placed, deposited, submitted, and/or

invested funds into Defendants' websites to play in their DFS contests.

45.     Had Plaintiffs and members of the proposed classes known that Defendants were

working in concert to allow employees of other outside DFS sites to play on their respective DFS

sites, and/or that Defendants' own employees were permitted to play on other outside company

DFS sites, Plaintiffs and members of the proposed classes would not have paid, placed,

deposited, submitted, and/or invested funds into Defendants' websites to play in their DFS

contests.

46.     Had Plaintiffs and/or members of the proposed classes known that Defendants

had acted in concert to sanction these practices, Plaintiffs and members of the proposed classes

would not have paid, placed, deposited, submitted, and/or invested funds into Defendants'

websites to play in their DFS contests.

## UNENFORCEABILITY
## OF ANY ARBITRATION CLAUSE

47.     To the extent Defendants have made arbitration a requirement to press claims

arising from the alleged contracts between the parties or its subject matter, such a requirement is

unconscionable as Plaintiffs and the proposed classes cannot vindicate their rights in arbitration

or seek a fair remedy in individual arbitration given the costs involved and the prospects of

individual recovery.

48.     Moreover, the alleged contracts do not constitute valid, mutual agreements.  The promises made by Defendants are illusory in that there is no restriction on their ability to terminate the alleged contract or refuse to perform for any reason.  Thus, in reality, Defendants are not bound to any performance obligation.  Moreover, Defendants are permitted by the terms of the alleged contract to revoke any player's rights thereunder, and thus not truly ever bound to perform.

49.     Moreover, the alleged contracts do not represent a genuine meeting of the minds as the terms of the alleged contracts were not and could not be negotiated.  In order to play on Defendants' websites, DFS players simply had to check a box stating that they read the Terms of Use and then submit a deposit of money.  Entry into Defendants' particular DFS contests were instituted through separate transactions.

50.     The terms of the alleged contracts are procedurally and substantively unconscionable so that equity and justice under the law could not be attained.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).  The Nationwide Class and Subclasses (together the "Classes") that Plaintiffs seek to represent are defined as follows:

A.  **Nationwide Class:** All persons who are citizens of the United States and have paid, placed, deposited, submitted, risked, and/or invested funds into Defendants' websites to play in their DFS contests.

B.  **New York Subclass:** All persons who incurred damages in the State of New York who have paid, placed, deposited, submitted, risked, and/or invested funds into Defendants' websites to play in their DFS contests.

C.  **New Jersey Subclass:** All persons who are citizens of the State of New Jersey and have paid, placed, deposited, submitted, risked, and/or invested funds into

Defendants' websites to play in their DFS contests.

D. **Florida Subclass:** All persons who are citizens of the State of Florida and have paid, placed, deposited, submitted, risked, and/or invested funds into Defendants' websites to play in their DFS contests.

52.     Excluded from the proposed Classes are (i) Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, predecessors, successors, and assigns; and (ii) any member of the immediate families of excluded persons.

53.     **Numerosity:** The members of the Classes are so numerous that joinder of all members is impracticable. The Classes are made up of hundreds or thousands of members. The precise number of class members can only be ascertained through discovery, which includes Defendant's membership and financial records. The disposition of their claims through a class action will benefit all parties and this Court.

54.     **Common Questions of Law and Fact:** There is a well-defined community of interest in the questions of law and fact involved affecting Plaintiffs and members of the Classes.

55.     The questions of law and fact common to the Classes, and predominate over questions which may affect individual members, and include the following:

a)   Whether Defendants, their directors, officers, and/or employees, made false, deceptive, unfair, and/or misleading statements or representations to Plaintiffs, class members and/or the public at large;

b)   Whether Defendants, their directors, officers, and/or employees, released false, deceptive, unfair, and/or advertisements to Plaintiffs, Class members and/or the public at large;

14

c) Whether Defendants permitted their employees to play on competitor DFS sites using their own company's non-public inside DFS information or analytics to gain a competitive player advantage; whether Defendants acted in concert to condone this practice, or whether it was the result of negligent management; and whether Defendants were aware of this practice and could and/or should have disclosed this to Plaintiffs and the Classes;

d) Whether Defendants, their directors, officers, and/or employees, owed duties of reasonable care to impart correct and reliable disclosure to Plaintiffs, class members and/or the public at large regarding the nature of the contests and competition, the degree of their fairness, the information, data, or analytics available to all contest players, and the company policy of permitting employees to play on competitor DFS websites;

e) Whether Defendants' false, deceptive, or misleading representations caused Plaintiffs and members of the Classes to pay, place, deposit, submit, risk, and/or invest funds into Defendants' websites to play in their DFS contests;

f) Whether and to what extent Plaintiffs and members of the Classes were injured by Defendants' false, fraudulent, deceptive, misleading, and/or negligent representations or other actions;

g) Whether the alleged contract between the parties, and specifically the Terms of Use and Arbitration clauses are legally binding or not because they are unconscionable, illusory, fraudulent, or otherwise legally invalid;

h) Whether Defendants, their directors, officers, and/or employees were unjustly enriched at the expense of Plaintiffs and members of the Classes.

56.    **Typicality**: The claims and defenses of Plaintiffs, as the representative Plaintiffs, are typical of the claims and defenses of the Classes because Plaintiffs and the members of the Classes all paid, placed, deposited, submitted, and/or invested funds into Defendants' websites to play in the contests provided by Defendants. Defendants' conduct and representations caused Plaintiffs, like all members of the Classes, to pay, place, deposit, submit, risk, and/or invest funds into Defendants' websites to play in their contests based on representations by Defendants that their contests were fair games of skill, that Defendants' maintained their contests' fairness and even-level playing field, and that all customers permitted to play had equal access to same set of DFS and sports information and analytics. Plaintiffs also qualify as typical of each respective subclass.

57.    **Adequacy of Representation**: Plaintiffs, as the representative Plaintiffs, will fairly and adequately assert and protect the interests of the class as:

a) Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the class; and

b) Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action.

58.    **Predominance**: With respect to the Damages Subclass and/or Class, questions common to the class predominate over those which only affect individual players. This case involves the same breach of integrity and fairness as to all DFS contests on Defendants' DFS websites. The same fraudulent representations and inducement were employed for all members of the class, regardless of which DFS contest was played by each individual class member. Liability will primarily be predicated upon the jury's evaluation of Defendants' misrepresentations, the breach of fairness to Defendants' DFS contests, and Defendants'

awareness of and company policies regarding whether Defendant employees maintained access to their company's confidential DFS player information and could use that information to play on competitor DFS sites.

59.     **Superiority**: A class action provides a fair and efficient method for the adjudication of controversy for the following reasons:

a)  The common questions of law and fact set forth above predominate over any questions affecting only individual class members;

b)  The class is so numerous as to make joinder impracticable.  The class, however, is not so numerous as to create manageability problems.  There are no unusual legal or factual issues which would create manageability problems;

c)  Prosecution of a separate action by individual members of the class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct;

d)  The claims of the individual class members are small in relation to the expenses of litigation, making a class action the only procedure in which class members can, as a practical matter, recover; and

e)  A class action would be superior to and more efficient than adjudicating thousands of individual lawsuits.

## COUNT I
## NEGLIGENT MISREPRESENTATION
### (Asserted by Plaintiffs and the other members of the Nationwide Class)

60.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

61.     Defendants maintained a contractual relationship with Plaintiffs and the class as DFS players who reasonably placed their trust and reliance in Defendants as their DFS

provider provide the DFS online platform, services, and contests as marketed and represented to the players, media, and public at large. Moreover, as the professional DFS contest providers, Defendants possessed unique or specialized expertise as to the nature of the DFS contests, the nature of the competition amongst players, the information – including non-public data and metrics– not available to Plaintiffs and the class, and the availability of inside information amongst players competing on their and other DFS sites.

62.     Because of this special relationship between the parties, Defendants owed a duty to use reasonable care to impart correct and reliable disclosure regarding the nature of the contests and competition, the degree of their fairness, the information, data, or analytics available to all contest players, and the company policy of permitting employees to play on competitor DFS websites.

63.     Defendants, through their agents, representatives, and employees, breached its duties to Plaintiffs and the proposed class by providing false, misleading, and/or deceptive information regarding the nature of the contests and their fairness. Defendants further breached their duty by failing to prevent persons with inside information and data by virtue of their employment at other competitor DFS sites from competing as DFS players against Plaintiff and the proposed class.

64.     Plaintiffs and the proposed class reasonably and justifiably relied upon the information supplied to them, the media, and the public by Defendants as their DFS online provider, and, as a result, placed, deposited, submitted, and/or invested funds into Defendants' websites to play in their contests and lost money.

65.     Defendants failed to use reasonable care in their communications about safety and security of data, employee access to data and ability of employees to use material, non-

public data to compete against Plaintiffs and the proposed class on other websites, or allow

employees of other companies with material, non-public access to compete on the website

where Plaintiffs and the proposed class competed.

66.     By virtue of Defendants' negligent misrepresentation, Plaintiffs and the

proposed class have been damaged in an amount to be proven at trial.

## COUNT II
## FRAUD AND MISREPRESENTATION
### (Asserted by Plaintiffs and the other members of the Nationwide Class)

67.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing

allegations as though fully set forth herein.

68.     Defendants intentionally made material representations regarding the nature of

their DFS contests, the nature and fairness of the competition within, and the availability of

information –both public and non-public – to the players that were false, misleading, and/or

deceptive.  Defendants were aware their representations were false, misleading, and/or

deceptive, or, at the least, were reckless as to the veracity of those representations.

69.     These false representations regarding the offered DFS contests served as an

inducement for Plaintiffs and the class to enter into a contract with Defendants and place,

deposit, submit, and/or invest funds into Defendants' websites to play in their contests.

70.     Defendants represented that their DFS contests were fair games of skill.

Defendants also willfully failed to disclose that employees, agents, owners and/or others with

non-public information, data and access to past and current player athlete selections used this

information to compete against Plaintiffs and the class with an informational advantage and

increased chance to win.  As a result, Plaintiffs and the class were left to compete at a relative

disadvantage with a decreased ability and statistically lower chance to win.

71.     Plaintiff and the proposed Classes acted in reliance on the false, material representations and willful omissions made by Defendants, which caused them injury.  Because of the alleged contract entered into by the parties, and the position of power, management, knowledge, and control held by DFS contest providers vis-à-vis their paying customer players, Plaintiffs and the proposed Classes were justified in relying upon Defendants to relay complete and accurate information regarding the DFS contests they provide for the public, and all relevant details.

72.     Plaintiffs and the proposed Classes would not have deposited money or engaged in any activity on Defendants' websites if they had known that they were competing against individuals with insider knowledge, access and use of non-public data.

73.     Defendants were aware that the integrity of the games was a material fact in inducing Plaintiffs and the proposed Class to give them money in exchange for services and agreeing to the alleged contract.

74.     As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiffs and the proposed Classes were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

### COUNT III
### VIOLATION OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES LAW (N.Y. GEN. BUS. § 349, et seq.)
**(Asserted by Plaintiffs McDaid and Walter and the members of the New York Subclass)**

75.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

76.     By the acts and conduct alleged herein, Defendants committed unfair or

deceptive acts and practices in the State of New York by making the misrepresentations described above.

77.     The foregoing acts, practices, and representations were directed at consumers, DFS players and/or potential DFS players who might use their websites and compete in their DFS contests. Even when directed at the media or non-consumer individuals who do not compete in DFS contests as provided by Defendants, their deceptive acts, practices, or representations were consumer-oriented, at or about their DFS contests as provided and made available to consumers.

78.     The foregoing deceptive acts and practices were misleading in a material way because they fundamentally misrepresented the nature of Defendants' DFS contests, the nature of the competition within, the degree of fairness and level playing field maintained, and the extent of inside, non-public information available to certain of their sites DFS players.

79.     Plaintiffs and members of the proposed New York Subclass were injured as a direct and proximate result of Defendants' violation of the NYDAPL G.B.L. § 349 which caused Class members injury and damage as they joined and paid, placed, deposited, submitted, risked, and/or invested funds into Defendant' websites, which they would not have done had they known the true facts and/or not been misled.

80.     Plaintiffs and members of the proposed New York Subclass were also injured as a direct and proximate result of Defendants' violation of the NYDAPL G.B.L. § 349 in that their ability to fairly compete and win cash prizes on an even playing field was impinged, and they, statistically, won less money as a result.

81.     By virtue of Defendants misrepresentations and willful omissions, Plaintiffs and members of the proposed New York Subclass have suffered damages. Accordingly, Plaintiffs

21

and the proposed New York Subclass seek to enjoin the unlawful acts and practices described

herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and

reasonable attorneys' fees and costs.

### COUNT IV
### VIOLATION OF THE NEW YORK FALSE ADVERTISING LAW
### (N.Y. GEN. BUS. § 350, *et seq.*)
**(Asserted by Plaintiffs McDaid and Walter and the members of the New York Subclass)**

82.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing

allegations as though fully set forth herein.

83.     By the acts and conduct alleged herein, Defendants committed false advertising

in the conduct of business, trade or commerce in the State of New York contrary to the New

York False Advertising Law, G.B.L. § 350, *et seq.*

84.     "False advertising" is defined as "advertising, including labeling, of a

commodity, or of the kind, character, terms or conditions of any employment opportunity if

such advertising is misleading in a material respect." The foregoing acts and practices were

directed at consumers. G.B.L. § 350-a.

85.     In an effort to increase business and, specifically, the volume of and company

profits from paying customers using their DFS websites to engage in DFS play, Defendants, in

the course of their business, targeted sports fans and the potential DFS players from the public

at large with false and misleading advertisements on television and other platforms.

86.     Defendants' advertisements were and continue to be false and misleading in a

material way because they fundamentally misrepresent the fair play and even-level playing field

available for all DFS players on their websites.  Moreover, Defendants' advertisements were

false and misleading in a material way because they failed to reveal to their viewers that

Defendants' employees – some of whom had access to non-public DFS player information and strategies -- were permitted to play in DFS contests on competitor company DFS websites. In light of Defendant's representations regarding the fairness of their contests and the degree to which a player's skill and knowledge of the relevant sport would determine the contests' winnings, the advertisements'' omissions were materially misleading.

87.     Plaintiffs and members of the Proposed New York Subclass were injured as a direct and proximate result of Defendants' violation of NYFAL because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts.

88.     Plaintiffs and members of the proposed New York Subclass were also injured in that their DFS cash prize winnings were statistically lowered as a result of Defendants' employees playing with non-public and insider information on competitor company DFS websites.

89.     Plaintiffs and the proposed New York Subclass seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees.

## COUNT V
## VIOLATIONS OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
(Asserted by Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano, and the members of the Florida Subclass)

90.     Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Plaintiffs assert this cause of action on behalf of themselves and the Florida Subclass.

91.     Sections 501.201 et. seq. are commonly known as the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

92.     Plaintiffs and the putative class are "Consumers" and "Interested Part[ies] or Person[s]" as defined by Fla. Stat. § 501.203(6) & (7) (the "Florida Class").

93.     Defendants are engaged in "Trade or Commerce" as defined in Fla. Stat. §501.203(8).

94.     In connection with Defendants' actions as set forth above in detail, Defendants committed unfair and/or deceptive acts and practices in violation of the FDUTPA.

93.     Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano and members of the Florida Subclass are consumers who deposited money into a DraftKings or FanDuel account and participated in contests and tournaments on the Defendants' DFS websites.

94.     The practices of Defendants violated the FDUTPA for, among other things, one or more of the following reasons:

a.      Defendants omitted and concealed material facts from its communications and disclosures to Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano, and all other members of the Florida Subclass regarding the true nature of their participation on Defendants' DFS websites;

b.      Defendants made false and/or misleading statements of material fact regarding participation on their DFS websites, which statements were likely to deceive the public; and

c.      Defendants knew, or were reckless in not knowing, that their statements regarding participation in their DFS websites were false and/or misleading.

95.     By the conduct described herein, Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

conduct of trade or commerce.

96.     The representations and omissions by Defendants were likely to deceive reasonable consumers and a reasonable consumer would have relied on these representations and omissions.

97.     Had Defendants disclosed all material information regarding their DFS websites to Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano, and all of the other members of the Florida Subclass, they would not have paid for entry into contests and deposited money on Defendants' DFS websites.

## COUNT VI
## VIOLATION OF THE NJCFA
(Asserted by Plaintiff Siegel and the members of the New Jersey Subclass)

98.     Plaintiff Jodi Siegel hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Plaintiff asserts this cause of action on behalf of herself and the New Jersey Subclass.

99.     The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . ." N.J.S.A. 56:8-2.

100.     Plaintiff Jodi Siegel and members of the New Jersey Subclass are consumers within the meaning of NJCFA who deposited money and paid for entry into contests on Defendants' DFS websites.

101.    Defendants engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the NJCFA.  Specifically, Defendants were aware that their contests were not fair games of skill as represented but failed to disclose this to Plaintiff Jodi Siegel and the New Jersey Subclass.

102.    Defendants also engaged in unlawful conduct in violation of the NJCFA by making knowing and intentional omissions.  Defendants failed to disclose that its employees, agents and owners who had access to non-public information and data as well as to Plaintiff's submissions, used this information to complete against Plaintiff and other members of the New Jersey Subclass, which significantly increased their chances of winning while significantly decreasing Plaintiffs' chances of winning.

103.    Defendants knowingly failed to disclose the material omissions discussed above and in more detail in the Complaint in order to secure Plaintiff Jodi Siegel's and other members of the New Jersey Subclass', participation in their DFS websites.

104.    A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiff Jodi Siegel and the New Jersey Subclass.  Had Defendants disclosed all material information regarding their DFS websites to Plaintiff Siegel and all of the other members of the Florida Subclass, they would not have paid for entry into contests and deposited money on Defendants' DFS websites.

## COUNT VII
## UNJUST ENRICHMENT

95.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

96.    Defendants and/or their employees were unjustly enriched at the expense of Plaintiffs and the class by using, without compensating, the DFS selection information of their

26

DFS athlete selections and that of other players to "perform analytics to determine winning strategies, return on investment of certain strategies, and how lineups on a competitor's website would do if they were entered into their company's contests." Defendant employees then exploited their access to their company's inside information to maintain an advantage when playing and earning cash winnings on a competitor's DFS site. Moreover, statistical data gained from Plaintiffs' and the class's DFS selections was used by Defendant employees to draft fantasy teams on competitor DFS sites that included athletes that weren't in widespread use in any given contest, thus increasing the odds of their winnings.

97.     Accordingly, it is clear that Defendant and/or its employees were enriched by using and then playing on non-public inside information from Plaintiffs' and the class's DFS selections.

98.     The Defendants' and/or employees' enrichment came at the expense of Plaintiffs and the class who were at a relative disadvantage competing against Defendant employees equipped with publically unavailable inside DFS information and analytics, and faced a statistically lessened chance of winning.

99.     After Defendants' deception and bad faith, it is against equity and good conscience to permit them or their employees to retain their additional earning which came as a result of playing on inside DFS information and analytics.

100.    Moreover, this unjust enrichment occurred while Plaintiffs and their class maintained a special relationship with and were in privity with Defendants and/or their employees which, as their DFS provider, caused them to reasonably rely and be induced by their business representations.

101.    Moreover, Plaintiffs and the members of the proposed class conferred a benefit

on Defendants by depositing money and playing in contests on their websites.

102.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and the members of the proposed classes deposits and contest entries, retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fair play available on their websites.

103.    Plaintiff and members of the proposed classes were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts. Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the proposed classes is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the proposed class for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, for themselves and all others similarly situated, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs, and grant the following relief:

A.    Determine that this action may be maintained as a class action with respect to a national class and with subclasses as asserted above, pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate, and that the Court designate and appoint Plaintiffs to serve as Class Representatives and the undersigned counsel as Class Counsel;

B.    Declare the conduct of Defendants as alleged herein to be unlawful;

C.      Grant Plaintiffs and the other Class Members awards of actual and compensatory or other statutory damages or relief, in such amount to be determined at trial and as provided by applicable law;

D.      Grant Plaintiffs and the other Class Members restitution of all monies wrongfully obtained by Defendants;

E.      Grant Plaintiffs and the other Class Members pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

F.      Grant Plaintiffs their costs of suit including reasonable attorneys' fees, and expenses, including expert fees, to the extent permitted by law; and

G.      Grant Plaintiffs and the other Class Members such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually, and on behalf of all others similarly situated, hereby demand trial by jury.

Dated: October 15, 2015

By:

s/Randy Perlmutter
s/Gary Graifman
Randy J. Perlmutter, Esq.
Gary S. Graifman, Esq.
KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977

Tel: (845) 356-2570
Rperlmutter@kgglaw.com
Ggraifman@kgglaw.com


Howard T. Longman, Esq. (HTL2489)
Melissa Emert, Esq.
STULL, STULL & BRODY
6 East 45th Street, Suite 500
New York, New York 10017
Tel: (212) 687-7230
Hlongman@ssbny.com
Memert@bellsouth.net


*Attorneys for Plaintiffs and the Putative
Classes*