# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
JOHN P. McDAID, SCOTT WALTERS, JODI )
SIEGEL, JEFFREY KAUFMAN, KEVIN )  Civil Action No. 1:15-cv-08181-GHW
UNGER, ALAN CORDOVER, JARRED )
LOKIETZ and BRANDON TARAGANO on )  **AMENDED CLASS ACTION**
behalf of themselves and all others similarly )  **COMPLAINT**
situated, )
 )
         Plaintiffs, )
 )
      vs. )  **JURY TRIAL DEMANDED**
 )
DRAFTKINGS, INC., FANDUEL, INC., )
FANDUEL DEPOSITS, LLC, and JOHN )
DOES 1-100 )
 )
        Defendants. )
_____

     Plaintiffs, John P. McDaid, Scott Walters, Jodi Siegel, Jeffrey Kaufman, Kevin Unger,

Alan Cordover, Jarred Lokietz and Brandon Taragano ("Plaintiffs"), individually, and on behalf

of all others similarly situated, by and through their counsel, bring this action against DraftKings,

Inc. ("DraftKings"), FanDuel, Inc. ("FanDuel") and (FanDuel Deposits, LLC, ("FanDuel

Deposits") (collectively the "Corporate Defendants") and John Does 1-100 (together with the

Corporate Defendants, "Defendants"), and state as follows:

## JURISDICTION AND VENUE

     1.     This Court has subject matter jurisdiction over this class action pursuant to 28

U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"),

provides federal courts original jurisdiction over any class action in which any member of a class is

a citizen of a state different from any defendant, and in which the matter in controversy exceeds

in the aggregate the sum of $5 million ($5,000,000.00), exclusive of interest and costs.

2.      This court has personal jurisdiction over Defendants in that they conduct substantial business activity in this District.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that many of the acts and transactions giving rise to this action occurred in the Southern District of New York and FanDuel's headquarters are in this District.

## THE PARTIES

4.      Plaintiff John P. McDaid is a resident of Rockville Centre, Nassau County, in the State of New York.

5.      Plaintiff Scott Walters is a resident of Merrick, Nassau County, in the State of New York.

6.      Plaintiff Jodi Siegel is a resident of Berkeley Heights, in the State of New Jersey.

7.      Plaintiff Jeffrey Kaufman is a resident of Parkland, in the State of Florida.

8.      Plaintiff Kevin Unger is a resident of Parkland, in the State of Florida.

9.      Plaintiff Alan Cordover is a resident of Parkland, in the State of Florida.

10.     Plaintiff Jarred Lokietz is a resident of Parkland, in the State of Florida.

11.     Plaintiff Brandon Taragano is a resident of Parkland, in the State of Florida.

12.     Defendant DraftKings is organized and existing under the laws of Delaware with its principal place of business located at 225 Franklin St., Boston, Massachusetts 02110.

13.     Defendant FanDuel is organized and existing under the laws of Delaware with its principal place of business located at 1375 Broadway, New York, New York 10018.

14.     Defendant FanDuel Deposits, LLC, is a Delaware limited liability company with its principal place of business in New York, New York. Defendant FanDuel Deposits LLC was created recently for the purpose of holding the funds deposited by FanDuel's players.

15.     Unknown "John Doe" Defendants 1-100, without limitation, are (1) the employees of FanDuel and DraftKings who, as described herein, exploited confidential inside information to gain an unfair edge against the Class (defined below), and/or (2) the persons who knowingly received confidential inside information from the employees of FanDuel and/or DraftKings and knowingly used the same to exploit the Class.   The identities of the John Doe Defendants are currently unknown to Plaintiffs and, once their identities are ascertained, Plaintiffs will seek leave to add them as Defendants in the instant action under their true names.

16.     Upon information and belief, Defendants conduct business, and communicate and transmit information in the course of their business through mail and wires, in and into the State of New York and this District.

### BACKGROUND INFORMATION

17.     The Corporate Defendants operate daily and weekly fantasy sports ("DFS") websites in a manner which give rise under the law to the claims in this Complaint.  The Corporate Defendants offer daily and weekly fantasy sports contests for cash prizes in major professional sports (*e.g.* MLB, NHL, NFL, and NBA), as well as college football and basketball.  The DFS industry offers contests which allow customers ("players") to create new "fantasy teams" each day or week by selecting a line-up of real-life athletes at certain positions until they have reached a given "salary cap" per team.  With their selected fantasy teams, players join new public and private leagues or tournaments ranging in size.  In these contests, individual players compete against other sports fans by accumulating points based on the real-life statistical performance of their selected professional or college athletes as they performed during the designated day or week.  The players who accumulate the most points win the most money.  These contests take place over a much shorter duration than the traditional season-long fantasy leagues and require no management on

the part of the player after the initial selection is finalized before the start of contest.  As a result, winners are determined daily or weekly and cash winnings can be collected within a short period.

18.     The Corporate Defendants each flooded the market with more than $100,000,000 worth of television advertisements at the start of the 2015 NFL season.  The Corporate Defendants were successful in adding millions of new players to their website contests as a result of this tremendous media campaign.[1]

19.     The charging of entry fees to enter a contest is the basis of the Corporate Defendants' revenues and profitability. The revenues the Corporate Defendants generate for each contest depends on the entry fee, among other factors, and vary widely.  The Corporate Defendants often guarantee prize pool winnings, and, when necessary, cover the difference for the contestants between the guaranteed prize amount and the sum total of entry fees.

20.     The difference between the entry fees and the guarantee in the prize pool is called the "overlay."  Because the overlay is guaranteed by the Corporate Defendants as the DFS provider, the Corporate Defendants maintain an additional incentive to attract as many customers and entries as possible into their DFS contests to avoid having to cover the overlay out of pocket.

21.     DraftKings relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their site.[2]

22.     The Chief Executive Officer ("CEO") of FanDuel has expressed a vision of molding its DFS website into a mass market site appealing to, not only sophisticated DFS players, but casual sports fans as well.[3]

---

[1]  http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/  (accessed Oct. 14, 2015)

[2]   See  https://rotogrinders.com/threads/dk-frequent-player-points-130623;   https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5 (accessed Oct. 14, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins).

[3]https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10

23.     Plaintiffs and members of the proposed Class and Subclasses, paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' and/or FanDuel's websites to play in their respective DFS contests.  For example:

a.     Over the past months prior to the filing of the complaint, Plaintiff John P. McDaid paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' and FanDuel's websites in the approximate amounts of $10 a week for DFS football contests and $2 a day for DFS baseball contests;

b.     Over the past months prior to the filing of the complaint, Plaintiff Scott Walters paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amounts of $40 a week for DFS football contests and $25-50 a month for DFS baseball and hockey contests;

c.     Over the past months prior to the filing of the complaint, Plaintiff Jodi Siegel paid, placed, deposited, submitted, risked, and/or invested money or funds into FanDuel's website in the approximate amount of $100;

d.     Over the past months prior to the filing of the complaint, Plaintiff Jeffrey Kaufman paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amount of $5;

e.     Over the past months prior to the filing of the complaint, Plaintiff Kevin Unger paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amount of $50 and approximately $25 in FanDuel's website;

f.     Over the past months prior to the filing of the complaint, Plaintiff Alan

(accessed Oct. 14, 2015).

5

Cordover paid, placed, deposited, submitted, risked, and/or invested money or funds into DraftKings' website in the approximate amount of $170;

g.     Over the past months prior to the filing of the complaint, Plaintiff Jarred Lokietz paid, placed, deposited, submitted, risked, and/or invested money or funds in the approximate amounts of $100 into DraftKings' website and $100 into FanDuel's websites;

h.     Over the past years and/or months prior to the filing of the complaint, Plaintiff Brandon Taragano twice paid, placed, deposited, submitted, risked, and/or invested money or funds in the approximate amount of $100 into DraftKings' website.

24.     The Corporate Defendants marketed and represented to the public that the fantasy sports contests run by their companies as provided on their websites were fair games of skill where sports fans could compete against one another and earn money on a fair and level playing field.

25.     The Corporate Defendants presented their websites as places where the Plaintiffs' skill made a difference between winning and losing.  For instance, in a television commercial[4] that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills….you like football, you like winning."  In another commercial in August 2015,[5] DraftKings advertised its website as "a game within the game, that requires a different set of skills…we don't just play, we are players, we train, and we win."

26.     Similarly, FanDuel advertised that players could "get paid for [their] knowledge" and directly implied that they could profit if they were "smarter than the average fan."[6]

27.     In reality, most of the cash winnings on DFS sites goes to a few individuals at the

---

[4] The commercial is available at https://www.youtube.com/watch?v=VDa-cDu8KYg (accessed Oct. 14, 2015).

[5] Available at https://www.youtube.com/watch?v=bfCm6PJuL5I (accessed Oct. 14, 2015).

[6] Available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge.

top.  An analysis of publicly available data by *Sports Business Daily* found that in the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[7] An analysis done by *Sports Business Journal* over a three month period showed a similar distribution heavily weighted towards the top 1.3% of players.[8]

28.    The Corporate Defendants represented that players who "do their homework," who are "analytical and favor data and research," could succeed like successful investors in the stock market.[9]

29.    In reality, the Corporate Defendants' contests were unfair and did not maintain an even-level playing field for all players.  Although the Corporate Defendants prohibited their employees from entering DFS contests on their own DFS sites, the Corporate Defendants' respective company policies permitted their employees, some of whom were equipped with the advantage of non-public, confidential, and/or internal company information and analytics, to enter DFS contests on competitor DFS websites for cash prizes along with the rest of the consumer population.

30.    The Corporate Defendants perform analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on a competitor's website would do if they were entered into their own company's contests.  The Corporate Defendants know and have known the value of this information and that it should not be revealed to players and/or the

---

[7] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 14, 2015).

[8] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (accessed Oct. 14, 2015)

[9] Howard Stutz, "DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing, Las Vegas Review-Journal," Sept. 29, 2015, available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (accessed Oct. 14, 2015).

playing public. With this data on optimal DFS playing strategies from years past, only available to some of the Corporate Defendants' employees and not the general playing public, those employees who are the John Doe Defendants can, and in fact did, exploit their access to their company's inside information to maintain a potential advantage when playing on a competitor's site.

31.     Moreover, individuals with real-time access as to how many active players selected certain athletes for their current "fantasy teams," would have a great advantage in competing for cash prizes in current contests offered by a competitor DFS site since the largest prizes are often won by customers whose teams are comprised of athletes appearing on fewer rosters who produce statistical strong athletic play during the day or week of the contest.[10]  Thus, the selection data can be used to a player's advantage to draft a team of athletes that appear on few rosters in a given contest thereby significantly increasing the relative share of winnings to be awarded to a contestant whose selected roster of athletes performed well.[11]  In this light, the majority of industry sources believe that knowing the ownership percentage of DFS players provides contestants with an advantage against competitor contestants.  Adding athletes who are being selected by only a small percentage of entrants is a prominent strategy in daily fantasy contests, especially in large contests with hundreds of thousands of entries.  Winning entries in these huge guaranteed prize pool tournaments, where millions of dollars are at stake, often feature a professional athlete or athletes who are owned by a small percentage of entrants, but go on to have better-than-expected performances.[12]

---

[10] Darren Rovell "Class action lawsuit filed against DraftKings and FanDuel," http://espn.go.com/espn/print?id= 13840184, Oct. 8, 2015.

[11] Associated Press, "Early lineup release raised questions about transparence of daily fantasy contests," http://www.usnews.com/news/sports/articles/2015/10/05/lineup-release-raises-questions-about-daily-fantasy-contests, Oct. 5, 2015.

[12] David Purdumand Darren Rovell, "Answering seven biggest questions on the DraftKings data leak,"

32.     Moreover, DFS employees' access to non-public, confidential, and/or internal company information provides them an advantage in their ability to copy strategies and rosters of high ranking successful DFS players and employ them on another competitor's DFS contest to thereby reap profits based on this insider information.

33.     In fact, DraftKings co-founder Paul Liberman recently stated at a conference held at Babson College that some of the Company's employees made more money from playing on other DFS sites than from their salaries at DraftKings.[13]

34.     Indeed, a DraftKings employee accidentally posted ownership percentages online before they were permitted to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed.  This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[14]

35.     However, the same week that he posted roster data prematurely, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[15]  An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com, covering DFS, to a position with DraftKings, working directly for a DFS company.

36.     In response to publication of the news of a DraftKings' employee winning $350,000, rather than admit what was patently clear -- that this employee had access to important

---

http://espn.go.com/chalk/story/_/id/13822696/chalk-breaking-significance-recent-draftkings-daily-fantasy-incident (accessed Oct 13, 2015).

[13] "Class action lawsuit filed against DraftKings and FanDuel," by Darren Rovell, http://espn.go.com/espn/print?id=13840184, Oct. 8, 2015.

[14] See https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 14, 2015) for the DraftKings employee's admission and apology.

[15] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 14, 2015).

DFS ownership data which most likely accounted for his tremendous winnings that day and throughout the year -- DraftKings and FanDuel both responded that his success was essentially a mere "coincidence" and unrelated to his employment at DraftKings.[16]

37.     In fact, on October 14, 2015, The New York Times reported that the Federal Bureau of Investigation ("FBI") had begun an inquiry into the practices of the DFS websites shortly after a DraftKing employee admitted to inadvertently releasing data before lineups for the start of the third week of N.F.L. The FBI had begun contacting several prominent competitors in the contests for interviews and had inquired if the players had knowledge of whether employees of DraftKings passed on proprietary information or preyed on fantasy players in contests.

38.     At least a number of Defendant John Doe employees have access to inside DFS data which could provide a competitive advantage in DFS competition on other websites.  These include Defendant employees working as customer service and engineering workers.   The company even maintains records of such employee access.[17]

39.      DraftKings' employees have won roughly $6,000,000 participating as players on FanDuels' website.[18]  This is an extraordinary amount considering DraftKings has only been in operation for a few years.  The incident also reveals that FanDuel can calculate and track which DFS players are associated with other DFS sites and how much they are winning or losing,[19] and the statistical likelihood that these players are using non-public information, data, and insider strategic information.

---

[16] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 14, 2015).

[17]  http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 14, 2015).

[18] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 14, 2015).

[19] Id (accessed Oct. 14, 2015).

40.     The Corporate Defendants were aware of their employees' participation on competitor DFS sites and winning high and statistically relevant amounts of cash winnings.

41.     In fact, FanDuel's CEO admitted to personally playing on competitor DFS sites, "including in [FanDuel's] companywide season long and daily leagues."[20]  Moreover, FanDuel even profiled one of its own employees who played on other DFS sites and had won $50,000 in a short period of time, but has since removed the article from its website.[21]

42.     An analysis by *Daily Fantasy Sports Report* also reveals that an employee at FanDuel who works in product operations is a top DFS player in the industry, despite only playing on one DFS site.  While there is no evidence this employee had access to ownership data, this individual has won at least $50,000 in the early part of the baseball season on other DFS sites. Significantly, one of this employee's responsibilities at FanDuel includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites.  Although the profile piece has been removed from FanDuel's website, a version remains on the internet. Another FanDuel employee, commenting in these reports, stated that: "The fact [that that FanDuel employee] does not play on FanDuel against you folks is a good thing.  He clearly has a winning strategy…or 10."[22]

43.     According to Legal Sports Report ("LSR"), an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale"

---

[20]     https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (accessed Oct. 14, 2015).

[21]     Richard Lawler, "DraftKings and FanDuel face questions about 'insider trading,'" http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/  (accessed Oct. 14, 2015).

[22] *Id*. (accessed Oct. 14, 2015).

is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[23]

44.    In addition to being aware of this practice, the Corporate Defendants have had reservations about its propriety, and considered alternative company policies to ensure that the Corporate Defendant employees could not play DFS on competitor DFS sites with an advantage and thereby negatively impact the integrity of the game.  In fact, Jason Robins, the chief executive of DraftKings, has noted that "he had 'some reservations' about [DFS] employees entering fantasy sports contests for cash prizes and privately suggested that his company and its rivals restrict the practice. . . . 'I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one [banning DFS company employees from participating in most online DFS contests] in place.'"[24]  Ultimately, the Corporate Defendants worked in concert to permit their employees by way of company policy and/or negligence, to play in DFS contests on competitor DFS websites and to permit employees of competitor DFS sites to play in DFS contests provided on their sites.

45.    In fact, The Wall Street Journal reported on October 7, 2015, that FanDuel and DraftKings permanently banned employees from playing on competing DFS sites in direct response to the FanDuel employee winning $350,000, demonstrating  that the Corporate Defendants understood that the John Doe Defendants playing on their respective website would create the perception among members of the proposed classes that the games were being played on an uneven playing field.

---

[23] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 14, 2015).

[24]  http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 14, 2015).

46.     The extent of FanDuel's knowledge and awareness of its employees DFS play on competitor sites and the dangers such activity posed to the DFS consumer public was recently revealed to the public for the first time in an exhibit attached to the complaint filed by the Office of the New York Attorney General ("NYAG") on November 17, 2015 against FanDuel.   In a document entitled FanDuel Employee DFS Information and Playing Policy ("FanDuel Employee Playing Policy"), FanDuel set forth a detailed policy statement authorizing its employees to engage in some forms of DFS play on its competitors' websites while prohibiting other forms of DFS play which would raise suspicions of unfair play.   Employees were asked to sign a document indicating that they understood these prohibitions and would abide by such policies.   Specifically, FanDuel policy permitted its employees to play DFS on competitor websites, but not to be "among the top five players by volume" on any specific site in order to avoid becoming "targets for accusations by others."   Similarly, FanDuel employees were also instructed never to account for more than 2% of entries in any tournament of more than 1,000 entries, or 5% in any tournament of more than 100, lest they "become targets of accusations."   Employees were also instructed not to enter a "head to head contest" as the 2nd person against the same opponent in more than one contest per day.   This rule was intended to "***limit*** the ability to exploit information about user performance, and will also limit the likelihood of complaints from users." (Emphasis added).   Thus, these were designed to try and stay below the radar to avoid detection of practices that FanDuel itself recognized were questionable.

47.     The FanDuel Employee Playing Policy set forth FanDuel's goals and principles, and risks to avoid, in promulgating its policies for FanDuel employee DFS play.   This document includes a discussion of FanDuel's avowed goals of ***limiting*** (but not stopping) the ability of their employees to exploit "inside information," including the selections of its top DFS users (and thus

their relative DFS value) and the win rates of potential opponents and at the same time both allowing this practice to continue and reassuring customers that FanDuel employees were not exploiting "inside information" on other sites This document reveals that FanDuel:

- encouraged employees to play DFS on other sites to better perform their jobs;

- insisted employees "[d]o no harm" through their DFS play on other sites in order to avoid suspicions or anger;

- expressed concern and thus awareness that FanDuel employees engage in DFS contests on competitor sites and engage in the practices of copying FanDuel customers' fantasy selections and targeting weak users as opponents on other sites.

48.     The FanDuel Employee Playing Policy reveals FanDuel's awareness, authorization, and promotion of its employees' DFS play on other sites which exploited its own customers' DFS playing information ("inside information") to unfairly and deceptively compete against the DFS public on an uneven playing field which causes damage to FanDuel's own customers.

49.     In the FanDuel Employee Playing Policy, FanDuel notified its employees of its company policy to collect all its employees' usernames on websites which they play DFS for money, and the company's right to reveal FanDuel employees' identity and FanDuel association to other DFS sites, including those on which they play.  Thus, FanDuel, and, upon information and belief, other DFS sites, have been in possession of the details of its employees' DFS play on competitor websites.

50.    Plaintiffs and members of the proposed Class and Subclasses, as defined below, were fraudulently induced into placing, depositing, submitting, and/or investing funds into the Corporate Defendants' websites believing the contests constituted fair games of skill that ensured an even-level playing field for all players where no players were permitted to compete with the advantage of access to non-public, confidential, and/or internal company information and/or analytics.

51.    Had Plaintiffs and members of the proposed Class and Subclasses known that the Corporate Defendants' contests were unfair and not on a level playing field, and/or that some players maintained an advantage by competing while maintaining access to non-public, confidential, and/or internal company information and analytics, including information and analytics generated by the Corporate Defendants or their employees, in the course of their business activities or otherwise, Plaintiffs and members of the proposed Class and Subclasses would not have paid, placed, deposited, submitted, and/or invested funds into the Corporate Defendants' websites to play in their DFS contests.

52.    Had Plaintiffs and members of the proposed Class and Subclasses known that the Corporate Defendants were working in concert to allow employees of other outside DFS sites to play on their respective DFS sites, and/or that the Corporate Defendants' own employees were permitted to play on other outside company DFS sites, Plaintiffs and members of the proposed Class and Subclasses would not have paid, placed, deposited, submitted, and/or invested funds into the Corporate Defendants' websites to play in their DFS contests.

53.    Had Plaintiffs and/or members of the proposed Class and Subclasses known that the Corporate Defendants had acted in concert to sanction these practices, Plaintiffs and members

of the proposed Class and Subclasses would not have paid, placed, deposited, submitted, and/or invested funds into the Corporate Defendants' websites to play in their DFS contests.

## SEGREGATION OF PLAYER FUNDS FROM OPERATING FUNDS

54.     Plaintiffs and members of the proposed Class and Subclasses maintain accounts on the Corporate Defendants' websites with real money that can be used to enter into weekly or daily contests.

55.     The Corporate Defendants take money from each entry as a fee and pay out winnings; the Corporate Defendants also sometimes add their own money to prize pools when entries fall short of a guaranteed prize pool.

56.     In recent months, for the first time, the Corporate Defendants' revenue fell from one week to the next, despite the Corporate Defendants continuing to spend tens of millions of dollars on television advertising.[25]

57.     As members of the Fantasy Sports Trade Association, the Corporate Defendants are required to keep player funds segregated:[26]

**Segregation of Player Funds**

The signatory company will hold player funds (whether they are funds on deposit, or as entry fees in live games) separate from their operational funds. Player funds will not be used to fund the growth of their business and at no time are player funds at risk if the company were to cease doing business. Notwithstanding the above, signatory companies recognize that all prizes are paid from the general assets of the signatory companies, and the winners are not paid out of a pool consisting of funds received for any given contest. Stated another way, signatory companies recognize they must pay winners of a contest the announced prize irrespective of the amount of funds received from entrants in that particular contest. Further, it

---

[25] *See* http://www.legalsportsreport.com/5426/draftkings-and-fanduel-nfl-week-6 (accessed October 19, 2015); *see also* https://twitter.com/darrenrovell/status/656136142878867456).

[26] *See* http://fsta.org/about/fsta-paid-entry-contest-operator-charter/ (last accessed October 19, 2015).

is recommended that each company has an annual audit performed,
ensuring that the appropriate player funds are being segregated.

58.     The CEO for FanDuel recently stated that he "personally drafted" the charter of the

Fantasy Sports Trade Association which includes this provision regarding segregation of funds.[27]

59.     Despite segregation of player funds being required by law and the Fantasy Sports

Trade Association, the Corporate Defendants have not provided proof that they are truly

segregating funds.

60.     The timing of incorporation and name of the new entity FanDuel Deposits LLC

demonstrates that, upon information and belief, FanDuel has not previously been segregating

operational and player funds as required.

61.     Should the Corporate Defendants freeze or otherwise use customer money for

operating or other uses, Plaintiffs would likely never be able to recover their money from the

Corporate Defendants.

62.     The Corporate Defendants have come under increasing scrutiny from federal and

state authorities.  Should any of these investigations or actions by federal or state authorities result

in criminal action against the Corporate Defendants, customer money would be in jeopardy of

being frozen or used by the Corporate Defendants for debt, payments to investors, legal fees or

other non-customer refund uses.

## UNENFORCEABILITY
## OF ANY ARBITRATION CLAUSE

63.     To the extent the Corporate Defendants have made arbitration a requirement to

press claims arising from the alleged contracts between the parties or its subject matter, such a

requirement is unconscionable as Plaintiffs and the proposed Class and Subclasses cannot

---

[27] http://www.legalsportsreport.com/5672/fanduel-ceo-government-regulation/

vindicate their rights in arbitration or seek a fair remedy in individual arbitration given the costs involved and the prospects of individual recovery.

64.     Moreover, the alleged contracts do not constitute valid, mutual agreements.  The promises made by the Corporate Defendants are illusory in that there is no restriction on their ability to terminate the alleged contract or refuse to perform for any reason.  Thus, in reality, the Corporate Defendants are not bound to any performance obligation.  Moreover, the Corporate Defendants are permitted by the terms of the alleged contract to revoke any player's rights thereunder, and thus not truly ever bound to perform.

65.     Moreover, the alleged contracts do not represent a genuine meeting of the minds as the terms of the alleged contracts were not and could not be negotiated.  In order to play on the Corporate Defendants' websites, DFS players simply had to check a box stating that they read the Terms of Use and then submit a deposit of money.  Entry into the Corporate Defendants' particular DFS contests were instituted through separate transactions.

66.     In addition, the arbitration provision is unenforceable as it did not clearly and unambiguously signal to Plaintiffs that they were surrendering their rights to pursue their statutory claims in court or have a jury decide the dispute.

67.     The terms of the alleged contracts are procedurally and substantively unconscionable so that equity and justice under the law could not be attained.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).  The Class and Subclasses that Plaintiffs seek to represent are defined as follows:

A.      **Nationwide Class:** All persons other than the John Doe Defendants who are citizens of the United States and have paid, placed, deposited, submitted,

risked, and/or invested funds into the Corporate Defendants' websites to play in their DFS contests (the "Class").

B.   **New York Subclass:**  All persons other than the John Doe Defendants who incurred damages in the State of New York who have paid, placed, deposited, submitted, risked, and/or invested funds into the Corporate Defendants' websites to play in their DFS contests (the "New York Subclass").

C.   **New Jersey Subclass:**  All persons other than the John Doe Defendants who are citizens of the State of New Jersey and have paid, placed, deposited, submitted, risked, and/or invested funds into the Corporate Defendants' websites to play in their DFS contests (the "New Jersey Subclass").

D.   **Florida Subclass:** All persons other than the John Doe Defendants who are citizens of the State of Florida and have paid, placed, deposited, submitted, risked, and/or invested funds into the Corporate Defendants' websites to play in their DFS contests (the "Florida Subclass").

69.   The New York Subclass, New Jersey Subclass and Florida Subclass are collectively referred to herein as the "Subclasses."

70.   Excluded from the proposed Class and Subclasses are (i) Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, predecessors, successors, and assigns; and (ii) any member of the immediate families of excluded persons.

71.   **Numerosity**: The members of the Class and Subclasses are so numerous that joinder of all members is impracticable.  The Class and Subclasses are made up of hundreds or thousands of members.  The precise number of Class and Subclass members can only be ascertained through discovery, which includes Defendant's membership and financial records. The disposition of their claims through a class action will benefit all parties and this Court.

72.   **Common Questions of Law and Fact:** There is a well-defined community of interest in the questions of law and fact involved affecting Plaintiffs and members of the Class and Subclasses.

73.     The questions of law and fact common to the Class and Subclasses, and predominate over questions which may affect individual members, and include the following:

a)      Whether the Corporate Defendants, their directors, officers, and/or employees, made false, deceptive, unfair, and/or misleading statements or representations to Plaintiffs, class members and/or the public at large;

b)      Whether the Corporate Defendants, their directors, officers, and/or employees, released false, deceptive, unfair, and/or advertisements to Plaintiffs, class members and/or the public at large;

c)      Whether the Corporate Defendants permitted their employees to play on competitor DFS sites using their own company's non-public inside DFS information or analytics to gain a competitive player advantage; whether the Corporate Defendants acted in concert to condone this practice, or whether it was the result of negligent management; and whether the Corporate Defendants were aware of this practice and could and/or should have disclosed this to Plaintiffs and the Class and Subclasses;

d)      Whether the Corporate Defendants, their directors, officers, and/or employees, owed duties of reasonable care to impart correct and reliable disclosure to Plaintiffs and other proposed Class and Subclass members and/or the public at large regarding the nature of the contests and competition, the degree of their fairness, the information, data, or analytics available to all contest players, and the company policy of permitting employees to play on competitor DFS websites;

e)      Whether the Corporate Defendants' false, deceptive, or misleading representations caused Plaintiffs and other members of the Class and Subclasses to pay, place, deposit, submit, risk, and/or invest funds into the Corporate Defendants' websites to

play in their DFS contests;

     f)     Whether and to what extent Plaintiffs and other members of the Class and Subclasses were injured by the Corporate Defendants' false, fraudulent, deceptive, misleading, and/or negligent representations or other actions;

     g)     Whether the alleged contract between the parties, and specifically the Terms of Use and Arbitration clauses are unconscionable, illusory, fraudulent, or otherwise legally invalid;

     h)     Whether Defendants, their directors, officers, and/or employees were unjustly enriched at the expense of Plaintiffs and other members of the Class and Subclasses.

74.    **Typicality**: The claims and defenses of Plaintiffs, as the representative Plaintiffs, are typical of the claims and defenses of the proposed Class and Subclasses because Plaintiffs and the members of the Class and Subclasses all paid, placed, deposited, submitted, and/or invested funds into the Corporate Defendants' websites to play in the contests provided by the Corporate Defendants.  The Corporate Defendants' conduct and representations caused Plaintiffs, like all members of the Class and Subclasses, to pay, place, deposit, submit, risk, and/or invest funds into the Corporate Defendants' websites to play in their contests based on representations by the Corporate Defendants that their contests were fair games of skill, that the Corporate Defendants' maintained their contests' fairness and even-level playing field, and that all customers permitted to play had equal access to same set of DFS and sports information and analytics.  Plaintiffs also qualify as typical of each respective Subclass.

75.    **Adequacy of Representation**: Plaintiffs, as the representative Plaintiffs, will fairly and adequately assert and protect the interests of the Class and Subclasses as:

a)      Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the class; and

b)      Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action.

76.      **Predominance**:   Questions common to the Class and Subclasses of players predominate over those which only affect individual players.  This case involves the same breach of integrity and fairness as to all DFS contests on the Corporate Defendants' DFS websites.  The same fraudulent representations and inducement were employed for all members of the proposed Class and Subclasses, regardless of which DFS contest was played by each individual class member.   Liability will primarily be predicated upon the jury's evaluation of the Corporate Defendants' misrepresentations, the breach of fairness to the Corporate Defendants' DFS contests, and the Corporate Defendants' awareness of and company policies regarding whether Defendant employees, including the John Doe Defendants, maintained access to their company's confidential DFS player information and could use that information to play on competitor DFS sites.  Indeed, Defendant FanDuel has judicially admitted that the claims of class members "are the same or overlapping – each challenging, in some fashion, the fairness of the Corporate Defendants' daily fantasy sports games."[28]

77.      **Superiority**: A class action provides a fair and efficient method for the adjudication of controversy for the following reasons:

a)      The common questions of law and fact set forth above predominate over any questions affecting only individual class members;

_____

[28] Defendant FanDuel Inc.'s Consolidated Response To Motion To Transfer Related Actions, MDL No. 2678, Doc. 48, p.1 (filed Dec. 3, 2015).

b)      The Class and Subclasses are so numerous as to make joinder impracticable. The Class and Subclasses, however, are not so numerous as to create manageability problems.  There are no unusual legal or factual issues which would create manageability problems;

c)      Prosecution of a separate action by individual members of the Class and Subclasses would create a risk of inconsistent and varying adjudications against the Corporate Defendants when confronted with incompatible standards of conduct;

d)      The claims of the individual Class and Subclass members are small in relation to the expenses of litigation, making a class action the only procedure in which class members can, as a practical matter, recover; and

e)      A class action would be superior to and more efficient than adjudicating thousands of individual lawsuits.

## COUNT I

## NEGLIGENT MISREPRESENTATION

**(Asserted by Plaintiffs and the other members of the Nationwide Class Against the Corporate Defendants)**

78.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

79.     The Corporate Defendants maintained a contractual relationship with Plaintiffs and the Class as DFS players who reasonably placed their trust and reliance in the Corporate Defendants as their DFS provider to provide the DFS online platform, services, and contests as marketed and represented to the players, media, and public at large.  Moreover, as the professional DFS contest providers, all Defendants possessed unique or specialized expertise as to the nature of the DFS contests, the nature of the competition amongst players, the information – including

non-public data and metrics – not available to Plaintiffs and the Class, and the availability of inside information amongst players competing on their and other DFS sites.

80.     Because of this special relationship between the parties, the Corporate Defendants each owed a duty to use reasonable care to impart correct and reliable disclosure regarding the nature of the contests and competition, the degree of their fairness, the information, data, or analytics available to all contest players, and the company policy of permitting employees to play on competitor DFS websites.

81.     The Corporate Defendants, through their agents, representatives, and employees, breached their duties to Plaintiffs and the proposed class by providing false, misleading, and/or deceptive information regarding the nature of the contests and their fairness.  The Corporate Defendants further breached their duty by failing to prevent persons with inside information and data by virtue of their employment at other competitor DFS sites from competing as DFS players against Plaintiffs and the proposed Class.

82.     Plaintiffs and the proposed Class reasonably and justifiably relied upon the information supplied to them, the media, and the public by the Corporate Defendants as their DFS online provider, and, as a result, placed, deposited, submitted, and/or invested funds into the Corporate Defendants' websites to play in their contests and lost money.

83.     The Corporate Defendants failed to use reasonable care in their communications about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiffs and the proposed Class on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiffs and the proposed Class competed.

84.     By virtue of the Corporate Defendants' negligent misrepresentation, Plaintiffs and

the proposed class have been damaged in an amount to be proven at trial.  Alternatively, Plaintiffs and the proposed class seek rescission and disgorgement under this count.

## COUNT II

## FRAUD AND MISREPRESENTATION

**(Asserted by Plaintiffs and the other members of the Nationwide Class
Against the Corporate Defendants)**

85.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein**.**

86.     The Corporate Defendants intentionally made material representations regarding the nature of their DFS contests, the nature and fairness of the competition within, and the availability of information – both public and non-public – to the players that were false, misleading, and/or deceptive.  The Corporate Defendants were aware their representations were false, misleading, and/or deceptive, or, at the least, were reckless as to the veracity of those representations.

87.     These false representations regarding the offered DFS contests served as an inducement for Plaintiffs and the Class to enter into a contract with the Corporate Defendants and place, deposit, submit, and/or invest funds into the Corporate Defendants' websites to play in their contests.

88.     The Corporate Defendants represented that their DFS contests were fair games of skill.  The Corporate Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to past and current player athlete selections used this information to compete against Plaintiffs and the Class with an informational advantage and increased chance to win.  As a result, Plaintiffs and the Class were left to compete at a relative disadvantage with a decreased ability and statistically lower chance to win.

89.     Plaintiffs and the proposed Class acted in reliance on the false, material representations and willful omissions made by the Corporate Defendants, which caused them injury.  Because of the alleged contract entered into by the parties, and the position of power, management, knowledge, and control held by DFS contest providers vis-à-vis their paying customer players, Plaintiffs and the proposed Class were justified in relying upon the Corporate Defendants to relay complete and accurate information regarding the DFS contests they provide for the public, and all relevant details.

90.     Plaintiffs and the proposed Class would not have deposited money or engaged in any activity on the Corporate Defendants' websites if they had known that they were competing against individuals with insider knowledge, access and use of non-public data.

91.     The Corporate Defendants were aware that the integrity of the games were material facts in inducing Plaintiffs and the proposed Class to give them money in exchange for services and agreeing to the alleged contract.

92.     As a result of the Corporate Defendants' fraudulent representations and fraudulent omissions, Plaintiffs and the proposed Class were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

## COUNT III

## VIOLATION OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES LAW
### (N.Y. GEN. BUS. § 349, *et seq.*)

**(Asserted by Plaintiffs McDaid and Walter and the members of the Nationwide Class and New York Subclass and Against FanDuel and FanDuel Deposits Only)**

93.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

94.     By the acts and conduct alleged herein, Defendants committed unfair or deceptive

acts and practices in the State of New York by making the misrepresentations described above.

95.     Defendants FanDuel and FanDuel Deposits have their principal place of business in New York, New York.

96.     The foregoing acts, practices, and representations were directed at consumers, DFS players and/or potential DFS players who might use their websites and compete in their DFS contests.  Even when directed at the media or non-consumer individuals who do not compete in DFS contests as provided by Defendants, their deceptive acts, practices, or representations were consumer-oriented, at or about their DFS contests as provided and made available to consumers.

97.     The foregoing deceptive acts and practices were misleading in a material way because they fundamentally misrepresented the nature of Defendants' DFS contests, the nature of the competition within, the degree of fairness and level playing field maintained, and the extent of inside, non-public information available to certain of their sites' DFS players.

98.     Plaintiffs and members of the proposed Class and New York Subclass were injured as a direct and proximate result of Defendants' violation of the NYDAPL G.B.L. § 349 which caused Class and New York Subclass members injury and damage as they joined and paid, placed, deposited, submitted, risked, and/or invested funds into Defendant' websites, which they would not have done had they known the true facts and/or not been misled.

99.     Plaintiffs and members of the proposed Class and New York Subclass were also injured as a direct and proximate result of Defendants' violation of the NYDAPL G.B.L. § 349 in that their ability to fairly compete and win cash prizes on an even playing field was impinged, and they, statistically, won less money as a result.

100.     By virtue of Defendants' misrepresentations and willful omissions, Plaintiffs and members of the proposed Class and New York Subclass have suffered injury and damages.

Accordingly, Plaintiffs and the proposed Class and New York Subclass seek to enjoin the unlawful acts and practices described herein, and, pursuant to NYDAPL G.B.L. § 349, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees and costs.

**COUNT IV**

**<u>VIOLATION OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES LAW</u>**
**<u>(N.Y. GEN. BUS. § 349, *et seq.*)</u>**

**(Asserted by Plaintiffs McDaid and Walter and the members of the New York Subclass Against DraftKings Only)**

101.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein**.**

102.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices in the State of New York by making the misrepresentations described above**.**

103.    The foregoing acts, practices, and representations were directed at consumers, DFS players and/or potential DFS players who might use their websites and compete in their DFS contests.  Even when directed at the media or non-consumer individuals who do not compete in DFS contests as provided by Defendant, its deceptive acts, practices, or representations were consumer-oriented, at or about their DFS contests as provided and made available to consumers.

104.    The foregoing deceptive acts and practices were misleading in a material way because they fundamentally misrepresented the nature of Defendant's DFS contests, the nature of the competition within, the degree of fairness and level playing field maintained, and the extent of inside, non-public information available to certain of its site's DFS players.

105.    Plaintiffs and members of the proposed New York Subclass were injured as a direct and proximate result of Defendant's violation of the NYDAPL G.B.L. § 349 which caused the

New York Subclass members injury and damage as they joined and paid, placed, deposited, submitted, risked, and/or invested funds into Defendant' websites, which they would not have done had they known the true facts and/or not been misled.

106.   Plaintiffs and members of the proposed New York Subclass were also injured as a direct and proximate result of Defendant's violation of the NYDAPL G.B.L. § 349 in that their ability to fairly compete and win cash prizes on an even playing field was impinged, and they, statistically, won less money as a result.

107.   By virtue of Defendant's misrepresentations and willful omissions, Plaintiffs and members of the proposed New York Subclass have suffered damages.  Accordingly, Plaintiffs and the proposed New York Subclass seek to enjoin the unlawful acts and practices described herein, and, pursuant to NYDAPL G.B.L. § 349, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees and costs.

## COUNT V

## <u>VIOLATION OF THE NEW YORK FALSE ADVERTISING LAW</u><br><u>(N.Y. GEN. BUS. § 350, *et seq.*)</u>

**(Asserted by Plaintiffs McDaid and Walter and the members of the Class and New York Subclass Against Defendant FanDuel)**

108.   Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

109.   By the acts and conduct alleged herein, Defendant FanDuel committed false advertising in the conduct of business, trade or commerce in the State of New York contrary to the New York False Advertising Law, G.B.L. § 350, *et seq.* ("NYFAL").

110.   "False advertising" is defined as "advertising, including labeling, of a commodity,

or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." The foregoing acts and practices were directed at consumers. G.B.L. § 350-a.

111.    In an effort to increase business and, specifically, the volume of and company profits from paying customers using their DFS websites to engage in DFS play, Defendant FanDuel, in the course of its business, targeted sports fans and the potential DFS players from the public at large with false and misleading advertisements on television and other platforms.

112.    Defendant's advertisements were and continue to be false and misleading in a material way because they fundamentally misrepresent the fair play and even-level playing field available for all DFS players on their websites.  Moreover, Defendant's advertisements were false and misleading in a material way because they failed to reveal to their viewers that Defendant's employees – some of whom had access to non-public DFS player information and strategies -- were permitted to play in DFS contests on competitor company DFS websites.  In light of Defendant's representations regarding the fairness of their contests and the degree to which a player's skill and knowledge of the relevant sport would determine the contests' winnings, the advertisements' omissions were materially misleading.

113.    Plaintiffs and members of the proposed Class and New York Subclass were injured as a direct and proximate result of Defendant's violation of NYFAL because they paid for entry into contests and deposited money onto Defendant's websites, which they would not have done had they known the true facts.

114.    Plaintiffs and members of the proposed Class and New York Subclass were also injured in that their DFS cash prize winnings were statistically lowered as a result of Defendant's employees playing with non-public and insider information on competitor company DFS websites.

115.   Plaintiffs and the proposed Class and New York Subclass seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees.

### COUNT VI

### VIOLATION OF THE NEW YORK FALSE ADVERTISING LAW (N.Y. GEN. BUS. § 350, *et seq.*)

**(Asserted by Plaintiffs McDaid and Walter and the members of the New York Subclass Against Defendant DraftKings)**

116.   Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

117.   By the acts and conduct alleged herein, Defendant DraftKings committed false advertising in the conduct of business, trade or commerce in the State of New York contrary to the New York False Advertising Law, G.B.L. § 350, *et seq.*

118.   "False advertising" is defined as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." The foregoing acts and practices were directed at consumers. G.B.L. § 350-a.

119.   In an effort to increase business and, specifically, the volume of and company profits from paying customers using their DFS websites to engage in DFS play, Defendant DraftKings, in the course of its business, targeted sports fans and the potential DFS players from the public at large with false and misleading advertisements on television and other platforms.

120.   Defendant's advertisements were and continue to be false and misleading in a material way because they fundamentally misrepresent the fair play and even-level playing field available for all DFS players on their websites.  Moreover, Defendant's advertisements were false

and misleading in a material way because they failed to reveal to their viewers that Defendant's employees – some of whom had access to non-public DFS player information and strategies -- were permitted to play in DFS contests on competitor company DFS websites.  In light of Defendant's representations regarding the fairness of their contests and the degree to which a player's skill and knowledge of the relevant sport would determine the contests' winnings, the advertisements' omissions were materially misleading.

121.    Plaintiffs and members of the proposed New York Subclass were injured as a direct and proximate result of Defendant's violation of NYFAL because they paid for entry into contests and deposited money onto Defendant's websites, which they would not have done had they known the true facts.

122.    Plaintiffs and members of the proposed New York Subclass were also injured in that their DFS cash prize winnings were statistically lowered as a result of Defendant's employees playing with non-public and insider information on competitor company DFS websites.

123.    Plaintiffs and the proposed New York Subclass seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, punitive damages, and reasonable attorneys' fees.

## COUNT VII

### VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")

**(Asserted by Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano, and the members of the Florida Subclass Against the Corporate Defendants)**

124.    Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Plaintiffs assert this cause of action on behalf of themselves and the proposed

Florida Subclass.

125.   Plaintiffs and the proposed Florida Subclass are "Consumers" and "Interested Part[ies] or Person[s]" as defined by Fla. Stat. § 501.203(6) & (7).

126.   The Corporate Defendants are engaged in "Trade or Commerce" as defined in Fla. Stat. §501.203(8).

127.   In connection with the Corporate Defendants' actions as set forth above in detail, Defendants committed unfair and/or deceptive acts and practices in violation of the FDUTPA.

128.   Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano and other members of the Florida Subclass are consumers who deposited money into a DraftKings or FanDuel account and participated in contests and tournaments on the Corporate Defendants' DFS websites.

129.   The practices of the Corporate Defendants violated the FDUTPA for, among other things, one or more of the following reasons:

a.   The Corporate Defendants omitted and concealed material facts from its communications and disclosures to Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano, and all other members of the Florida Subclass regarding the true nature of their participation on the Corporate Defendants' DFS websites;

b.   The Corporate Defendants made false and/or misleading statements of material fact regarding participation on their DFS websites, which statements were likely to deceive the public; and

c.   The Corporate Defendants knew, or were reckless in not knowing, that their statements regarding participation in their DFS websites were false and/or misleading.

130.    By the conduct described herein, the Corporate Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce.

131.    The representations and omissions by the Corporate Defendants were likely to deceive reasonable consumers and a reasonable consumer would have relied on these representations and omissions.

132.    Had the Corporate Defendants disclosed all material information regarding their DFS websites to Plaintiffs Lokietz, Kaufman, Cordover, Unger, and Taragano, and all of the other members of the Florida Subclass, they would not have paid for entry into contests and deposited money on the Corporate Defendants' DFS websites.

**COUNT VIII**

**<u>VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("NJCFA")</u>**

**(Asserted by Plaintiff Siegel and the members of the New Jersey Subclass
Against the Corporate Defendants)**

133.    Plaintiff Jodi Siegel hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Plaintiff asserts this cause of action on behalf of herself and the proposed New Jersey Subclass.

134.    The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . ." N.J.S.A. 56:8-2.

135.    Plaintiff Jodi Siegel and members of the New Jersey Subclass are consumers within

the meaning of NJCFA who deposited money and paid for entry into contests on the Corporate Defendants' DFS websites.

136.    The Corporate Defendants engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the NJCFA.  Specifically, the Corporate Defendants were aware that their contests were not fair games of skill as represented but failed to disclose this to Plaintiff Jodi Siegel and the New Jersey Subclass.

137.    The Corporate Defendants also engaged in unlawful conduct in violation of the NJCFA by making knowing and intentional omissions.  The Corporate Defendants failed to disclose that its employees, agents and owners who had access to non-public information and data as well as to Plaintiff's submissions, used this information to complete against Plaintiff and other members of the New Jersey Subclass, which significantly increased their chances of winning while significantly decreasing Plaintiffs' chances of winning.

138.    The Corporate Defendants knowingly failed to disclose the material omissions discussed above and in more detail in the Complaint in order to secure Plaintiff Jodi Siegel's and other members of the New Jersey Subclass', participation in their DFS websites.

139.    As a result of the Corporate Defendants' omissions, misrepresentations, and unconscionable commercial practices, Plaintiff and the proposed New Jersey Subclass suffered ascertainable losses. In the case of Plaintiff Siegel, in particular, she expended at least $100, which were funds she would not have paid has she known the truth about the Corporate Defendants

140.    A causal relationship exists between the Corporate Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiff Jodi Siegel and the New Jersey Subclass.  Had the Corporate Defendants disclosed all material information regarding their DFS websites to Plaintiff Siegel and all of the other members of the proposed New Jersey Subclass, they would not

have paid for entry into contests and deposited money on the Corporate Defendants' DFS websites.

## COUNT IX

## VIOLATION OF TRUTH-IN-LENDING CONSUMER CONTRACT, WARRANTY AND NOTICE ACT ("TCCWNA"), N.J.S.A. 56:12-14

**(Asserted by Plaintiff Siegel and the members of the New Jersey Subclass Against the Corporate Defendants)**

141.    Plaintiff Jodi Siegel hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Plaintiff asserts this cause of action on behalf of herself and the proposed New Jersey Subclass.

142.    TCCWNA provides in part that:

> "No seller…shall in the course of his business offer to any consumer or prospective consumer or enter into any written contract or give or display any written consumer warranty, notice or sign…***which includes any provision that violates a clearly established right of a consumer or responsibility of a seller***…as established by State or Federal Law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed."

N.J.S.A. 56:12-14 (emphasis added).

143.     As alleged above, the Corporate Defendants have violated NJCFA, and have thus been in violation of TCCWNA.  The rights afforded to Plaintiff Siegel and other proposed New Jersey Subclass members is a clearly established right which was violated by the Corporate Defendants' inclusion of an illegal and unenforceable arbitration clause in its "Terms of Use" agreement that Plaintiff and other proposed New Jersey Subclass members are required to agree to in order to participate on Defendant's online DFS contests.  The arbitration clause contained in the Terms of Use agreements did not clearly indicate that Plaintiff and other members of the proposed New Jersey Subclass were giving up their right to go to court since it failed to explain what arbitration is, explain how arbitration is different from a court proceeding, and failed to use

language that is plain and understandable to the average consumer.

144.    The arbitration clauses contained in the Terms of Use agreements were thus an unconscionable commercial practice in violation of the New Jersey Consumer Fraud Act. Moreover, the Corporate Defendants' inclusion of these illegal and unenforceable arbitration clauses is in violation of a clearly established consumer right and/or of the responsibilities of the seller.  Accordingly, the Corporate Defendants have violated TCCWNA.

145.    In addition, for the reasons stated above in Count VIII, the Corporate Defendants have violated the NJCFA which is a violation of clearly established right under New Jersey law pursuant to TCCWNA.

146.    TCCWNA also provides that: "any person who violates the provisions of this act shall be liable to the aggrieved consumer whom he aggrieved or injured for a civil damages penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs.  The rights, remedies and prohibitions accorded by the provisions of this act are hereby declared to be in addition to and cumulative of any other right, remedy or prohibition accorded by common law, Federal law or statutes of this State." *Id.*

147.    The Corporate Defendants have violated TCCWNA and the Plaintiff and proposed New Jersey Subclass members request civil damages penalties of not less than $100.00 per violation and attorney's fees as provided under N.J.S.A. 56:12-14.

## COUNT X

## UNJUST ENRICHMENT

### (Against all Defendants)

148.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

149.    Defendants and/or their employees were unjustly enriched at the expense of Plaintiffs and the proposed Class and Subclasses by using, without compensating, the DFS selection information of their DFS athlete selections and that of other DFS players to "perform analytics to determine winning strategies, return on investment of certain strategies, and how lineups on a competitor's website would do if they were entered into their company's contests." Defendant employees then exploited their access to their company's inside information to maintain an advantage when playing and earning cash winnings on a competitor's DFS site.   Moreover, statistical data gained from Plaintiffs and the proposed Class and the Subclasses' DFS selections was used by John Doe Defendants to draft fantasy teams on competitor DFS sites that included athletes that were not in widespread use in any given contest, thus increasing the odds of their winnings.

150.    Indeed, as DraftKings alleged in its complaint against Eric T. Schneiderman, in his official capacity as Attorney General of the State of New York; and the State of New York,

> 29. The skill-based nature of DFS games has been repeatedly confirmed by leading experts. For example, Ed Miller—an MIT-trained engineer and noted author of gaming strategy books—and Daniel Singer—the leader of McKinsey & Company's Global Sports and Gaming Practice—penned an article published by Sports Business Daily entitled: "For daily fantasy sports operators, the curse of too much skill." Among Miller and Singer's conclusions was the assertion that in the first half of the 2015 MLB season, 91% of DFS player profits were won by just 1.3% of players.
>
> 30.    Miller and Singer also identified two primary ways in which skilled users succeed over unskilled users: (1) skilled users employ lineups that create covariance by choosing multiple athletes from the same real-life team in order to produce the extreme DFS outcomes—good and bad—that are necessary to win a large field tournament; and (2) skilled users exploit salary cap pricing inefficiencies by using sophisticated models to optimize their lineups by projecting which athletes are most likely to under- or over-perform relative to their salary on a given day.

151.    Additionally, as noted by the cease-and-desist letter sent from New York State to

DraftKings, "the top one percent of DraftKings' winners receive the vast majority of the winnings." In its Complaint filed against New York, DraftKings alleged that "[t]hose players win with greater frequency precisely because DFS is a game of skill that rewards experience, talent, and improvement over time."

152.    Similarly, FanDuel alleged in its complaint against Eric T. Schneiderman, in his official capacity as Attorney General of the State of New York; and the State of New York that "[g]iven the deep sports knowledge and strategic thinking required in these contests, it is natural and expected that more skilled and experienced players will win more often."

153.    Given the fact that a relatively small amount of highly skilled players win a largely disproportionate amount of the prizes on DraftKings and FanDuel, it took almost no effort for the John Doe Defendants to win on a competitor's site: all the John Doe Defendants had to do was identify the weekly strategies employed by those persons and free-ride upon their skill. No independent skill was required.

154.    Moreover, confirming the unfairness of the use of inside information, DraftKings has since implemented an "Updated Policy on Employee Participation" (on https://www.draftkings.com/help/faq) which states, *inter alia*, that "We have engaged a legal team from Greenberg Traurig, led by former United States Attorney John Pappalardo, to conduct a thorough review to help strengthen our existing policies and controls and ensure a level-playing field[;]" and that "DraftKings has implemented a policy prohibiting employees from other DFS sites from playing in any DraftKings contests that are open to the public." The same website asserts that "if it's discovered that other DFS site employees used internal data to their advantage on DraftKings" that DraftKings "will take strong and immediate action based on the specific circumstances."

155.    Similarly, FanDuel's Terms of Use (available at https://www.fanduel.com/terms) **now** state that "By depositing money or entering a contest, you are representing and warranting that: When entering any contest that awards prizes, you are not an employee or operator of another daily fantasy site that charges entrance fees or offers cash prizes."  The Terms also require that:

> Employees or operators of other daily fantasy sites that charge entry fees or offer cash prizes, including but not limited to DraftKings, Sportsline.com, and Yahoo, and individuals who, by virtue of affiliation with another daily fantasy site, have access to the site's pre-release non-public confidential data about game-related information may not enter any contests in which a real money prize is awarded. If such person enters a FanDuel contest that awards prizes, FanDuel will disqualify the entry, will not award a prize, and may report such person's violation of this provision to the daily fantasy site for which the entrant is employed by, operates or affiliated with. Additionally, FanDuel may maintain information about the entrant sufficient to assist FanDuel in blocking the user from entering future FanDuel contests, unless and until FanDuel determines, in its sole discretion, that the entrant is no longer an employee or operator of another daily fantasy site or no longer has access to pre-release non-public confidential data about game-related information by virtue of affiliation with a daily fantasy site.

156.    Not only were the John Doe Defendants unjustly enriched by their own actions, the Corporate Defendants were also unjustly enriched by the actions of the John Doe Defendants because the Corporate Defendants profited from the same: if members of the Class had known they were competing against John Doe Defendants, who were playing a game of limited information with superior non-public information, they would not have played and the Corporate Defendants would not have profited by taking a portion of the deposits lost by the Class to the John Doe Defendants  As the Supreme Court recognized, in an analogous situation, in adopting a presumption of reliance in securities fraud cases, "It has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).  In short, the Class was tricked into playing a crooked game, and their deposits were split, in large part, by

the John Doe Defendants and the Corporate Defendants.

157.   Accordingly, it is clear that Defendants and/or its employees were enriched by using and then playing on non-public inside information from Plaintiffs and the proposed Class and the Subclasses' DFS selections.

158.   The Defendants and/or employees' enrichment came at the expense of Plaintiffs and the proposed Class and the Subclasses who were at a relative disadvantage competing against Defendant employees equipped with publically unavailable inside DFS information and analytics, and faced a statistically lessened chance of winning.

159.   Defendants' deception and bad faith is contrary to principles of equity to permit them or their employees to retain their additional earnings which came as a result of playing on inside DFS information and analytics would constitute unjust enrichment.

160.   Moreover, this unjust enrichment occurred while Plaintiffs and the proposed Class and the Subclasses maintained a special relationship with and were in privity with Defendants and/or their employees which, as their DFS provider, caused them to reasonably rely and be induced by their business representations.

161.   Moreover, Plaintiffs and the proposed Class and Subclasses conferred a benefit on Defendants by depositing money and playing in contests on their websites.

162.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and the proposed Class and Subclasses' deposits and contest entries, retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fair play available on their websites.

163.   Plaintiffs and members of the proposed Class and Subclasses were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for

entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts. Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiffs and the members of the proposed classes is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the members of the proposed Class and Subclasses for their unjust enrichment, as ordered by the Court.

**COUNT XI**

**<u>VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)</u>**

(Asserted by Plaintiffs and the other members of the Nationwide Class
Against the Corporate Defendants )

164.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth herein.

165.    The Lanham Act, 15 U.S.C. § 1125(a), entitled, "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

   d.   Civil action

   (1)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

   (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

   (B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

   shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

166.    FanDuel and DraftKings used and/or continue to use in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake, or deceive Plaintiffs and the proposed Class as to the nature of the commerce Plaintiffs and the proposed Class were engaging in by playing daily fantasy games operated by FanDuel and DraftKings.

167.    FanDuel and DraftKings held out their websites like marketplaces where Plaintiffs and other members of the proposed Class could fairly meet and compete against one another. Plaintiffs and other members of the proposed Class were led to believe that these sites operated like a stock market where they could invest and compete based on public information available to all players.   As DraftKings' CEO Jason Robins said, DraftKings attracts players "who are analytical and favor data and research."  Robins said, "They do their homework.  It's like the stock market.  They enjoy looking at something and trying to figure out something that someone else doesn't see."

168.    As more fully alleged above, the Corporate Defendants had a duty to disclose to Plaintiffs and other proposed Class members that their employees had access to inside information not available to the general public that allowed these employees more advantages than non-employee players in these marketplaces.  Such statements as "winners are determined by the individuals who use their skill and knowledge of relevant professional sports information and fantasy sports rules to accumulate the most fantasy points" were misleading since the Corporate Defendants' employees had superior information to other players such as Plaintiff and other members of the proposed Class.

169.    The Corporate Defendants also had a duty to disclose to Plaintiffs and the other proposed Class members that their employees viewed this insider information as part of their

compensation for working for the Corporate Defendants.  As fully alleged above, both DraftKings and FanDuel were well aware that the John Doe Defendants made more money from their winnings in DFS games than their actual salaries.  DraftKings and FanDuel had considered banning their employees from playing DFS games, but opted not to do so in an attempt to retain their employees by allowing them to use inside information in DFS games as part of their compensation.

170.    FanDuel and DraftKings' misleading representations of fact concerning the fairness of the DFS marketplaces, and particularly the failure to disclose the information accessible to the John Doe Defendants who competed in such marketplaces, deceived and/or continue to deceive Plaintiff and other proposed Class members.

171.    FanDuel and DraftKings' misleading representations of fact concerning the fairness of the DFS marketplaces were made in commercial advertising or promotion for their websites.

172.    FanDuel and DraftKings' misleading representations were widely distributed as demonstrated by the fact that at the start of the 2015 NFL season, the Corporate Defendants engaged in a huge media blitz, spending more than $100,000,000 on television ads, thereby becoming two of the top television advertisers in the United States.  The Corporate Defendants added millions of new users as a result of this advertising.

173.    Such advertising contained misrepresentations of fairness in the DFS marketplaces. For example, FanDuel advertised that players could "get paid for [their] knowledge" if they were "smarter than the average fan."  In fact, non-employee players were unfairly disadvantaged in these DFS marketplaces compared to the Corporate Defendants' employees.

174.    Plaintiffs and other proposed Class members were unaware of the falsity of the Corporate Defendants' misrepresentations and omissions and, as a result, justifiably relied on them in participating in the online fantasy sports offered by the Corporate Defendants.

175.    FanDuel and DraftKings' misleading representations of fact concerning the fairness of the DFS marketplaces were likely to influence Plaintiff and other proposed Class members' decisions to play and invest in DFS games.

176.    Plaintiffs and other proposed Class members were injured with respect to, among other things, their property and possessory rights in the investments they have made in DFS games operated by the Corporate Defendants.

177.    Plaintiffs and other proposed Class members' damages were proximately caused by the Corporate Defendants' misleading representations as described herein.

178.    FanDuel and DraftKings' representations, statements and commentary, as more fully set forth above, were made with knowledge or reckless disregard of their falsity and the resulting risk and damage to the Plaintiff and other members of the proposed Class.

179.    FanDuel and DraftKings' acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act and entitle Plaintiff, individually and on behalf of the other proposed Class members, to recover damages, the costs of this action, and because this case is exceptional, reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, for themselves and all others similarly situated, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs, and grant the following relief:

A.    Determine that this action may be maintained as a class action with respect to a national class and subclasses, as asserted above, pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate;, and that the Court designate and appoint Plaintiffs to serve as Class and Subclass Representatives and the undersigned counsel as Class Counsel;

B.      Declare the conduct of Defendants as alleged herein to be unlawful;

C.      Grant Plaintiffs and the other proposed Class Members awards of actual and compensatory or other statutory damages or relief, in such amount to be determined at trial and as provided by applicable law;

D.      Grant Plaintiffs and the other proposed Class Members restitution of all monies wrongfully obtained by Defendants;

E.      Grant Plaintiffs and the other proposed Class Members pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

F.      Grant Plaintiffs their costs of suit including reasonable attorneys' fees, and expenses, including expert fees, to the extent permitted by law; and

G.      Grant Plaintiffs and the other proposed Class Members such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually, and on behalf of all others similarly situated, hereby demand trial by jury.

Dated: January 27, 2016              By:   *s/Gary Graifman*
                                           Gary S. Graifman, Esq.
                                           Randy J. Perlmutter, Esq.
                                           KANTROWITZ, GOLDHAMER &
                                           GRAIFMAN, P.C.
                                           747 Chestnut Ridge Road
                                           Chestnut Ridge, NY 10977
                                           Tel: (845) 356-2570
                                           ggraifman@kgglaw.com
                                           rperlmutter@kgglaw.com

Howard T. Longman, Esq.
Melissa Emert, Esq.
STULL, STULL & BRODY
6 East 45th Street, Suite 500
New York, New York 10017
Tel: (212) 687-7230
hlongman@ssbny.com
memert@bellsouth.net

***Attorneys for Plaintiffs and the Putative
Class***